1 | Janet H. Kwuon (SBN 143807)
David E. Stanley (SBN 144025)
2 | Eric J. Buhr (SBN 217528)
REED SMITH LLP
3 | 355 S. Grand Avenue
Suite 2900
4 | Los Angeles, CA 90071

5 | Telephone: +1 213 457 8000
Facsimile: +1 213 457 8088
6 | Attorneys for Defendants
Eli Lilly and Company
7 | and Lilly USA, LLC

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11 | JOHN NAGEL and CHERYL NAGEL,

12 | Plaintiffs,

13 | vs.

14 | ELI LILLY AND CO.; LILLY USA, INC.;
MCKESSON CORPORATION; and DOES 1-50,
15 | inclusive,

16 | Defendants.

| Case No.:

[Removal from Superior Court of California, San Francisco County – Case No. CGC 14-539199]

**DEFENDANTS ELI LILLY AND CO. AND LILLY USA, LLC'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(B)**

[Filed concurrently with Corporate Disclosure Statement, Notice of Pendency of Other Actions or Proceedings, and Certification of Interested Persons]

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**TO THE CLERK OF THE COURT:**

**PLEASE TAKE NOTICE** that defendants Eli Lilly and Company and Lilly USA, LLC (erroneously sued as Lily USA, Inc.) (collectively "Lilly") hereby remove the state court action described below to this Court. Removal is warranted under 28 U.S.C. § 1441 because this is a diversity action over which this Court has original jurisdiction under 28 U.S.C. § 1332. Complete diversity of citizenship exists among all parties to this action and San Francisco County is the county of origin for purposes of removal under 28 U.S.C. § 1441(a), as explained more fully below.

## BACKGROUND

1.      On May 9, 2014, Plaintiffs John Nagel and Cheryl Nagel ("Plaintiffs") commenced this action entitled *Nagel v. Eli Lilly and Co., et al.*, Case No. CGC 14-539199 ("the/this action"), against Lilly and McKesson Corporation by filing a Complaint in San Francisco County Superior Court. A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "A."

2.      No further proceedings have been had in the state court action.

3.      As more fully set forth below, this case is properly removed to this Court pursuant to 28 U.S.C. § 1441 because Lilly has satisfied the procedural requirements for removal and this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. In filing this Notice of Removal, Defendants reserve all defenses, including but not limited to lack of personal jurisdiction, improper venue, insufficient process, insufficient service of process, and failure to join and/or misjoinder of parties.

## I.      LILLY HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL

4.      As of the filing of this removal, Lilly has not been served with the Complaint in this action. Upon information and belief, McKesson Corporation has also not yet been served with the Complaint.[1] This Notice is therefore timely under 28 U.S.C. § 1446(b).

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 84(a) because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

---

[1] The consent of unserved defendants is not required for successful removal. *See, e.g.*, 28 U.S.C. § 1441(b); *see also Kopff v. World Research Group, LLC*, 289 F. Supp. 2d 50, 55 (D.D.C. 2003); *Roberts v. Palmer*, 354 F. Supp. 2d 1041, 1044 (E.D. Mo. 2005) ("It is well recognized that the consent of unserved defendants need not be obtained to effectuate removal.") (citations omitted).

6. All of the properly joined and served defendants consent to this removal. The Complaint purports to name McKesson Corporation (hereinafter, "McKesson") as a co-defendant, but because McKesson has not been properly joined or served in this lawsuit, its consent to this removal is not required. *See* 28 U.S.C. § 1441(b); *see Hewitt v. City of Stanton*, 798 F.2d 1230, 1233 (9th Cir. 1986) (co-defendants who are fraudulently joined need not join in a removal).

7. No party in interest properly joined and served as a defendant is a citizen of the State in which this action was brought, California. *See* 28 U.S.C. § 1441(b). The Complaint purports to name McKesson Corporation (hereinafter, "McKesson"), a California citizen, as a co-defendant. But to the best of Lilly's knowledge, McKesson has not been served with the Complaint and thus is not "properly joined and served" within the meaning of 28 U.S.C. § 1441(b). *See Regal Stone Ltd. v. Longs Drugs Stores Cal. L.L.C.*, 881 F. Supp. 2d 1123, 1127 (N.D. Cal. 2012) ("[T]he clear and ambiguous language of [Section 1441(b)] only prohibits removal after a properly joined forum defendant has been served. This district follows that approach.") (citations omitted); *Cucci v. Edwards*, 510 F. Supp. 2d 479, 482 (C.D. Cal. 2007) (Under Section 1441(b), "a resident defendant who has not been served may be ignored in determining removability") (quoting Wright et al., Federal Practice & Procedure § 3723 (2d ed. 1985)). In addition, as discussed in more detail below, because McKesson is fraudulently joined to this lawsuit, its California citizenship is not a barrier to removal jurisdiction under the forum defendant rule. *See* 28 U.S.C. § 1441(b); *United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d 756, 762 (9th Cir. 2002).

8. No previous request has been made for the relief requested herein.

9. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiffs and a copy is being filed with the Clerk of the Court for the Superior Court of the State of California for the County of San Francisco.

## II. REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different states.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

— 3 —

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### A.    The Amount In Controversy Requirement Is Satisfied

11.    It is apparent on the face of the Complaint that Plaintiffs seek an amount in controversy in excess of $75,000, exclusive of costs and interest.[2]

12.    The Complaint alleges that Plaintiff John Nagel suffered "significant injuries from the use of Axiron, including severe and permanent bodily injury, pain and suffering, disability, mental anguish and loss of capacity for the enjoyment of life, and the expense of medical and nursing care." *See* Ex. A, ¶ 63.   The Complaint also alleges that Plaintiff Cheryl Nagel suffered "a loss of affection, solace, companionship, society, assistance and sexual relations" due to the injury sustained by Plaintiff John Nagel. *See* Ex. A, ¶ 65.

13.    Plaintiffs also seek punitive and exemplary damages. *Id.* at ¶ 66.   Punitive damages are included in the calculation of the amount in controversy. *See Bell v. Preferred Life Assurance Society*, 320 U.S. 238, 240 (1943).   Given the allegations set forth above, the face of the Complaint makes clear that Plaintiffs seek in excess of $75,000, exclusive of interest and costs.

14.    Federal courts considering complaints alleging similar damages have held that the amount in controversy requirement readily is met and diversity jurisdiction exists. *See e.g., White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003) (it was "facially apparent" that claim exceeded $75,000 based on plaintiff's "lengthy list of compensatory and punitive damages"); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (concluding that complaint "obviously asserts a claim exceeding $75,000" where plaintiff seeks "compensatory and punitive damages" for alleged "serious and life-threatening medical conditions" and economic losses due to the use of a prescription medication).

### B.    There Is Complete Diversity Of Citizenship

15.    There is complete diversity of citizenship between all parties to this action.

16.    Plaintiffs John and Cheryl Nagel are and were citizens and residents of the state of

---

2 Lilly does not concede that Plaintiffs are in fact, entitled to recover more than $75,000. *See Gafford v. Gen. Elec. Co.,* 997 F.2d 150, 159 (6th Cir. 1993) (observing that a removing defendant is not required "to research, state and prove the plaintiff's claims for damages"); *Kelderman v. Remington Arms Co.*, 734 F. Supp. 1527, 1528 (S.D. Iowa 1990) (rejecting a plaintiff's attempt to "place [a] defendant in the awkward position of embracing a concession on the important issue of damages," to establish jurisdiction, noting that a "defendant need not go that far").   Indeed, Lilly denies that Plaintiffs are entitled to recover any damages.

DEFENDANTS ELI LILLY AND CO. AND LILY USA, LLC.'S NOTICE OF REMOVAL

Texas.  (Exhibit A, Complaint ¶ 5)

17. Defendant Eli Lilly and Company is, and was at the time Plaintiffs commenced this action, a corporation organized under the laws of Indiana, with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285, and therefore, is a citizen of Indiana for purposes of determining diversity.  28 U.S.C. § 1332(c)(1).  Defendant Lilly USA, LLC is, and was at the time Plaintiffs commenced this action, a limited liability company with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  The citizenship of a limited liability company is determined by the citizenship of its members.  Lilly USA, LLC is wholly owned by Eli Lilly and Company, a corporation organized under the laws of Indiana, and therefore is a citizen of Indiana for the purposes of determining diversity.  28 U.S.C. § 1332(c)(1).

18. Defendant McKesson Corporation is and was at the time Plaintiffs commenced this action a corporation incorporated and existing under the laws of Delaware with its principal place of business in California, and, thus, is a citizen of Delaware and California for purposes of determining diversity.  (Exhibit A, Complaint ¶ 9)

**C.** **The Citizenship Of McKesson Must Be Ignored Because It Is Fraudulently Joined, As The Complaint States Neither A Factual Nor Legal Basis For A Claim Against It**

19. As set forth above, the only resident defendant, McKesson, has not been served with the Complaint and thus is not "properly joined and served" within the meaning of 28 U.S.C. § 1441(b).  In addition, even if McKesson was properly served, McKesson has been fraudulently joined and, therefore, its citizenship must be ignored for the purpose of determining the propriety of removal.  *See McCabe v. Gen. Foods*, 811 F.2d 1336, 1339 (9th Cir. 1987).  A defendant is fraudulently joined and the defendant's presence in the lawsuit is ignored for purposes of determining diversity where no viable cause of action has been stated against the resident defendant.  *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001); *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318-19 (9th Cir. 1998); *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d 1089, 1100 (C.D. Cal. 2002).  The fraudulent joinder of McKesson is obvious under well-settled state law because: (1) Plaintiffs have failed to allege any factual basis for the claims asserted against

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 5 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  McKesson and (2) there is no legal basis for the claims Plaintiffs seek to bring against McKesson as

2  pleaded.

3       20.     McKesson is fraudulently joined because Plaintiffs have failed to make any material

4  allegations against it. *See, e.g., Brown v. Allstate Insur.*, 17 F. Supp. 2d 1134, 1137 (S.D. Cal. 1998)

5  (finding in-state defendants fraudulently joined where "no material allegations against [the in-state

6  defendants] are made"); *Lyons v. Am. Tobacco Co.*, No. Civ. A. 96-0881-BH-S, 1997 WL 809677, at

7  *5 (S.D. Ala. Sept. 30, 1997) (holding that there is "no better admission of fraudulent joinder of [the

8  resident defendants]" than the failure of plaintiff "to set forth any specific factual allegations"

9  against them). Here, there are no specific allegations directed toward McKesson, compelling the

10 conclusion that Plaintiffs fraudulently joined McKesson in an attempt to defeat diversity jurisdiction.

11 *See, e.g., Lyons*, 1997 WL 809677, at *5. Plaintiffs cannot cure this deficiency by simply relying on

12 allegations directed toward "Defendants" alone. *See In re PPA*, MDL No. 1407, 2002 WL

13 34418423, at *5 (finding allegations directed toward "defendants" or "all defendants" insufficient).

14      21.     The crux of the Complaint is an alleged failure to warn adequately of alleged risks

15 associated with the use of Axiron, yet notably absent are any specific allegations that McKesson

16 made any specific representations or warranties to Plaintiffs or Plaintiffs' prescribing physicians, or

17 that Plaintiffs or Plaintiffs' prescribing physicians relied on any such specific representations or

18 warranties by McKesson. Accordingly, Plaintiffs have failed to meet the minimal pleading

19 requirements to state a claim against McKesson. *See, e.g., Taylor AG Indus. V. Pure-Gro*, 54 F.3d

20 555, 558 (9th Cir. 1995) (dismissing breach of express warranty claim against distributor due to

21 plaintiffs' failure to identify any statements made by the distributor that were inconsistent with or

22 went beyond either the product labels or the Product Guide provided by manufacturer); *see also Cox*

23 *v. Depuy Motech, Inc.*, No. 95-CV-3848-L(JA), 2000 WL 1160486 (S.D. Cal. Mar. 29, 2000)

24 (causation is an essential element of strict liability and negligence claims); *Keith v. Buchanan*, 173

25 Cal. App. 3d 13, 25 (1985) (actual reliance is an element of an implied warranty claim); *B.L.M. v.*

26 *Sabo & Deitsch*, 55 Cal. App. 4th 823, 834 (1997) (to state a claim of negligent misrepresentation,

27 plaintiff must at least identify the alleged misrepresentation); *In re Pradaxa (Dabigatran Etexilate)*

28 *Prods. Liab. Litig.*, No. 3:12-cv-600922-DRH-SCW, slip op. at 17 (S.D. Ill. Feb. 22, 2013) (finding

– 6 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  that plaintiff failed to allege a causal link between McKesson and the allegedly injurious product) (a

2  true and correct copy is attached hereto as Exhibit "B").

3        22.     Moreover, there is no legal basis for the causes of action that Plaintiffs assert against

4  McKesson because the claims are based on an alleged failure to warn that is premised, for

5  McKesson, on a non-existent duty to warn. Under California law, McKesson bears no duty to warn

6  based on the "learned intermediary" doctrine. The "learned intermediary" doctrine, the foundation

7  of prescription drug product liability law, provides that the duty to warn about a drug's risks runs

8  from the manufacturer to the physician (the "learned intermediary"), and then from the physician to

9  the patient. *See Brown v. Superior Court (Abbott Labs.)*, 44 Cal. 3d 1049, 1061-62, n.9 (1988);

10  *Carlin v. Superior Court (Upjohn Co.)*, 13 Cal. 4th 1104, 1116 (1996). Thus, an alleged distributor,

11  like McKesson, has no duty whatsoever. *See, e.g., Barlow v. Warner-Lambert Co.*, Case No. CV 03

12  1647 R (RZx), slip op. at 2 (C.D. Cal. Apr. 28, 2003) ("The Court finds that there is no possibility

13  that plaintiffs could prove a cause of action against McKesson, an entity which distributed this FDA-

14  approved medication [Rezulin] to pharmacists in California"; denying motion to remand) (a true and

15  correct copy is attached hereto as Exhibit "C"); *Skinner v. Warner-Lambert Co.*, Case No. CV 03

16  1643-R (RZx), 2003 WL 25598915 (C.D. Cal. Apr. 28, 2003) (same); *Murphy v. E.R. Squibb &*

17  *Sons, Inc.*, 40 Cal. 3d 672, 680-81 (1985) (under the learned intermediary doctrine, retail pharmacies

18  can have no general duty to warn consumers of effects of prescription drugs); *In re Baycol Prods.*

19  *Litig.*, MDL No. 1431 (MJD), Case No. 02-139, 2002 WL 32155268 (D. Minn. May 24, 2002)

20  (retail distributor of prescription drugs fraudulently joined); *Schaerrer v. Stewart's Plaza Pharmacy*,

21  79 P.3d 922, 929 (Utah 2003) (declining to extend duty to warn to retail distributor of prescription

22  diet drug as long as its "ability to distribute prescription drugs is limited by the highly restricted

23  FDA-regulated drug distribution system in this country"). Furthermore, even if McKesson had

24  distributed any of Plaintiffs' medication, as a mere distributor it could not have affected the label. It

25  is therefore impossible for Plaintiffs to state a claim against McKesson based on a failure to warn

26  theory. *See PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011) (holding that state law tort claims

27  against generic manufacturers are preempted because of generic manufacturers' inability to modify

28  FDA-approved warning labels); *see also Stevens v. Cmty. Healthcare, Inc.*, No. ESCV200702080,

1  2011 WL 6379298 (Mass. Superior Oct. 5, 2011) (applying *PLIVA* to pharmaceutical distributors,

2  who are also unable to modify FDA-approved warning label); *In re Fosamax Prods. Liab. Litig.*,

3  2012 U.S. Dist. LEXIS 5817, at *21 (D.N.J. Jan. 17, 2012) ("As a distributor of Fosamax, Watson

4  has no power to change Fosamax labeling."). For this reason, courts have rejected imposing liability

5  on distributors like McKesson for failure to warn of the risk of a prescribed drug.

6       23.    The general allegation that "Defendants" knew of the alleged risks associated with the

7  use of Axiron are particularly deficient because the wholly conclusory claims are undermined and

8  contradicted by the more specific allegations of Lilly's concealment and misrepresentation of the

9  same information. *See, e.g.*, *In re PPA*, 2002 WL 34418423, at *7 (allegations that "manufacturer

10  defendants concealed material facts regarding PPA through product packaging, labeling, advertising,

11  promotional campaigns and materials, and other methods . . . directly undermines and contradicts the

12  idea that [the resident retail defendant] had knowledge or reason to know of alleged defects"). The

13  allegations of Lilly's purported concealment and misrepresentation of the alleged risks of Axiron

14  belie any inference that McKesson, a wholesale distributor, had knowledge of that which was

15  allegedly concealed.

16

17       WHEREFORE, Lilly respectfully removes the action from the Superior Court of the State of

18  California for the County of San Francisco to this Court, pursuant to 28 U.S.C. §1441.

19

20       DATED:  May 12, 2014          REED SMITH LLP

21

22                                    By:  */s/ David E. Stanley*
                                         _____
23                                         Janet H. Kwuon
                                           David E. Stanley
24                                         Eric J. Buhr
                                           Attorneys for Defendants
25                                         Eli Lilly and Company and Lilly USA, LLC

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 8 –

**EXHIBIT A**

FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

2014 MAY -9 PM 12: 06

CLERK OF THE COURT
BY:_____
DEPUTY CLERK

M.A. MORAN

1  Eric H. Gibbs (State Bar No. 178658)
   ehg@girardgibbs.com
2  Amy M. Zeman (State Bar No. 273100)
   amz@girardgibbs.com
3  Phyra M. McCandless (State Bar No. 260021)
   pmm@girardgibbs.com
4  **GIRARD GIBBS LLP**
5  601 California Street, 14th Floor
   San Francisco, California 94108
6  Telephone: (415) 981-4800
   Facsimile: (415) 981-4846
7
8  Michael Danko (State Bar No. 111359)
   mdanko@dankolaw.com
9  Kristine K. Meredith (State Bar No. 158243)
   kmeredith@dankolaw.com
10 **DANKO MEREDITH**
   333 Twin Dolphin Dr., Ste 145
11 Redwood City, CA 94065
   Telephone: (650) 453-3600
12 Facsimile: (650) 394-8672
13 Norman E. Siegel (MO Bar No. 44378)
   *(Pro hac vice to be submitted)*
14 siegel@stuevesiegel.com
   Todd E. Hilton (MO Bar No. 51388)
15 *(Pro hac vice to be submitted)*
   hilton@stuevesiegel.com
16 **STUEVE SIEGEL HANSON LLP**
   460 Nichols Road, Suite 200
17 Kansas City, MO 64112
   Telephone: (816) 714-7100
18 Facsimile: (816) 714-7101
19 Attorneys for Plaintiffs

20
21          **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

                     **COUNTY OF SAN FRANCISCO**
22

23  JOHN NAGEL and CHERYL NAGEL;          Case No.    **CGC 14-539199**

24  Plaintiffs,

25        vs.                            **COMPLAINT FOR:**

26                                       1) STRICT LIABILITY: DESIGN DEFECT
    ELI LILLY AND CO.; LILLY USA INC;    2) NEGLIGENCE
27  MCKESSON CORPORATION; and DOES 1-    3) FAILURE TO WARN
    50 INCLUSIVE,                        4) BREACH OF EXPRESS WARRANTY
28                                       5) BREACH OF IMPLIED WARRANTY
    Defendants.                          6) FRAUD: MISREPRESENTATION
29

                                    1
                        COMPLAINT FOR DAMAGES

7) FRAUD: CONCEALMENT
8) FRAUD: NEGLIGENT
    MISREPRESENTATION
9) LOSS OF CONSORTIUM

**DEMAND FOR JURY TRIAL**

Plaintiffs JOHN NAGEL and CHERYL NAGEL, by and through undersigned counsel, hereby file this Complaint for Damages and Jury Demand against Defendants ELI LILLY AND CO., LILLY USA INC, MCKESSON CORPORATION, and DOES 1 through 50, and each of them, inclusive (jointly "Defendants") and in support, state as follows:

I. **INTRODUCTION**

1.      Defendants created a perception of a "disease" called "low T," characterized by aging, stress, depression, and lethargy, which was to be treated with prescription testosterone in the form of gels, patches, pellets, and injections.

2.      Defendants misrepresented that prescription testosterone is a safe and effective treatment for hypogonadism, "low testosterone," or "low T," when prescription testosterone can cause serious injuries, including heart attack, stroke, thrombotic events, and other serious health conditions.

3.      As a result of Defendants' conduct, diagnoses of hypogonadism through "Low T" symptoms and prescriptions for testosterone replacement therapy have increased substantially. For example, sales of Axiron reached $257 million between October 2011 and September 2012.

4.      Plaintiff John Nagel was diagnosed with "low testosterone" and was prescribed testosterone. As a result of his prescription testosterone use, Plaintiff suffered serious and permanent injuries, and thus seeks damages relating to the Defendants' development, design, testing, labeling, packaging, manufacturing, selling, marketing, advertising, promotion, and distribution of prescription testosterone.

II. **PARTIES**

5.      Plaintiffs John Nagel and Cheryl Nagel are residents and citizens of Texas.

6.      Defendant Eli Lilly and Company is a corporation organized and existing under the laws of Indiana with its principal place of business at Lilly Corporate Center, Indianapolis,

2

COMPLAINT FOR DAMAGES

1  Indiana 46285. At all times relevant herein, Defendant Eli Lilly was engaged in the research,

2  development, manufacture, sales, marketing, and/or distribution of pharmaceutical products,

3  including Axiron throughout the United States and in the State of California.

4         7.     Defendant Lilly USA, Inc. is a limited liability company operating as a wholly

5  owned subsidiary of Defendant Eli Lilly and Company, with its principal place of business at

6  Lilly Corporate Center, Indianapolis, Indiana 46285. At all times relevant herein, Defendant

7  Lilly USA was engaged in the research, development, manufacture, sales, marketing, and/or

8  distribution of pharmaceutical products, including Axiron throughout the United States and in

9  the State of California.

10         8.     Acrux Limited originally developed Axiron. In March of 2010, Acrux and Eli

11  Lilly and Company entered into an exclusive worldwide license agreement for the

12  commercialization of Axiron. On November 23, 2010, Axiron received FDA approval.

13         9.     Defendant McKesson Corporation is a Delaware corporation with its principal

14  place of business at One Post Street, San Francisco, California 94104. McKesson is in the

15  business of labeling, selling, marketing, packaging, re-packaging and distributing prescription

16  testosterone including the Axiron used by Plaintiff John Nagel. Defendant does business

17  throughout the United States and in the State of California and regularly and continuously did

18  business within this judicial district including manufacturing, marketing, advertising, selling, and

19  distributing Axiron.

20        10.    Plaintiffs do not know the true names and capacities of DOES 1-50 inclusive.

21  Plaintiffs will seek leave to amend when the true names and identities of said fictitiously named

22  defendants are ascertained. At all relevant times herein DOES 1-50 inclusive were the

23  individuals, corporations, and/or business entities, which were agents, servants, joint ventures,

24  partners, co-conspirators, participants or otherwise ratified the conduct of the other Defendants

25  as alleged herein.

26        11.    At all relevant times, Defendants acted in concert with one another to fraudulently

27  convey false and misleading information concerning the safety and efficacy of prescription

28  testosterone and to conceal the risks of serious adverse events, including heart attack, stroke, and

29  other adverse effects associated with prescription testosterone from the public, Plaintiffs,

3

COMPLAINT FOR DAMAGES

1  physicians, and other healthcare providers. These concerted efforts resulted in significant harm to

2  those treated with prescription testosterone including Plaintiff John Nagel. But for the actions of

3  Defendants, individually, jointly, and in concert with one another, Plaintiff would not have used

4  prescription testosterone.

5      12.    The combined acts and/or omissions of each Defendant resulted in indivisible

6  injury to Plaintiffs. Each of the above-named Defendants is a joint tortfeasor and/or co-

7  conspirator and is jointly and severally liable to Plaintiffs for the negligent acts and omissions

8  alleged herein. Each of the above-named Defendants directed, authorized or ratified the conduct

9  of each and every other Defendant.

10  **III.   VENUE & JURISDICTION**

11      13.    This Court has personal jurisdiction over Defendants. Defendants are and were at

12  all relevant times residents of and/or authorized to conduct business in the State of California and

13  Defendants conducted such business within the state including the performance of acts that

14  caused or contributed to the harm giving rise to this action.

15      14.    At all relevant times, Defendants maintained systematic and continuous contacts

16  in this judicial district, regularly transacted business within this judicial district, employed

17  numerous individuals in this district, and regularly availed themselves of the benefits of this

18  judicial district. Defendants received substantial financial benefit and profits as a result of

19  designing, manufacturing, marketing, advertising, selling and distributing prescription

20  testosterone in this district and throughout the United States.

21      15.    The amount in controversy exceeds the jurisdictional limits of this court.

22  **IV.   GENERAL ALLEGATIONS**

23                       **BACKGROUND**

24      16.    Testosterone is an androgen and a hormone. In males, testosterone is responsible

25  for many normal functions, including growth and development of the genitals, muscles, and

26  bones. It also helps cause normal sexual development (puberty) in boys. It works by affecting

27  many body systems so that the body can develop and function normally. In men, testosterone

28  levels normally begin a gradual decline after the age of thirty.

29

COMPLAINT FOR DAMAGES

17.     Testosterone replacement therapy is prescribed for hypogonadism, which is diminished activity of the testes in men. One of the signs of hypogonadism is low testosterone. The FDA has approved testosterone therapy only for men who lack or have low testosterone associated with medical conditions, such as when the testicles fail to produce testosterone. Testosterone therapy as an FDA-approved treatment for hypogonadism has been used in some adolescent boys to cause puberty in those with delayed puberty.

18.     Prescription testosterone injections have been approved for over 60 years; however, with the rise in marketing of testosterone treatment, a number of products are now widely available.

19.     Testosterone stimulates red blood cell production, and an increase in red blood cells is called polycythemia. Polycythemia can be accompanied with an increase in hemoglobin and hematocrit, which can lead to increased blood viscosity. Therefore, administering exogenous (outside the body) testosterone can lead to polycythemia, which increases stroke and heart attack risk.

20.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood; however, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Therefore, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

## PRESCRIPTION TESTOSTERONE PRODUCTS

21.     Prescription testosterone comes in the form of gels, patches, pellets, tablets, and injections.

22.     Axiron is a hydroalcoholic gel containing testosterone applied to the underarms. The FDA approved Axiron on November 23, 2010.

## PRESCRIPTION TESTOSTERONE EFFECTS AND INJURIES

23.     According to the Food and Drug Administration:

Testosterone products are FDA-approved only for use in men who lack or have
low testosterone levels in conjunction with an associated medical condition.
Examples of these conditions include failure of the testicles to produce
testosterone, because of reasons such as genetic problems or chemotherapy. Other
examples include problems with brain structures, called the hypothalamus and
pituitary that control the production of testosterone by the testicles.

5

COMPLAINT FOR DAMAGES

FDA Safety Announcement, "FDA evaluating risk of stroke, heart attack and death with FDA-approved testosterone products," January 31, 2014.

24. According to an Institute of Medicine report published in 2004, "A systematic review of the medical literature on testosterone therapy, particularly placebo-controlled trials in older men, demonstrated that there is not clear evidence of benefit for any of the health outcomes examined," which included bone health, body composition and strength, physical function, cognitive function, mood and depression, sexual function, and health-related quality of life.

25. Prescription testosterone may produce undesirable side effects to patients who use the drug, including but not limited to death, cardiovascular events, stroke, and thrombotic events.

26. Due to the increased production of red blood cells from testosterone therapy, hemoglobin and hematocrit levels increase after testosterone administration and may take as long as 90 days to return to baseline levels.

27. There have been studies suggesting that prescription testosterone in men increases the risk of cardiovascular events, such as heart attacks and strokes.

28. In 2010, a *New England Journal of Medicine Study* entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events. Out of 106 men taking testosterone in the study, 23 experienced cardiovascular-related events (including heart attacks and atrial fibrillation) compared to 5 in the 103-man control group who had not used the prescription testosterone gel.

29. In November of 2013, a study was published in the *Journal of the American Medical Association* entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack, and stroke by about 30%.

30. On January 29, 2014, a study was released in *PLoS ONE* entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

6

COMPLAINT FOR DAMAGES

31.     Thrombotic events, such as pulmonary embolism, deep vein thrombosis, and other serious blood clots have been identified as adverse events reported by prescription testosterone users, although they have not been highlighted in the labels.

32.     Additional side effects of prescription testosterone include: acne; skin irritation (where testosterone is applied); increased cholesterol levels; increased prostate specific antigen; increased red blood cell count requiring patients to frequently donate blood; increased liver function tests; and excessive frequency and duration of erections.

33.     Secondary exposure to prescription testosterone can cause side effects in others. For example, in 2009, the FDA issued a black box warning for AndroGel prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with prescription testosterone.

## TESTOSTERONE MARKETING AND PROMOTION

34.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

35.     Defendants coordinated an advertising campaign designed to convince men that they suffered from low testosterone. Defendants orchestrated a national disease awareness campaign that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential prescription testosterone users, and online media.

36.     Television advertisements for testosterone suggest various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experiences any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

COMPLAINT FOR DAMAGES

37.     A national education campaign included the creation and continued operation of the website www.IsItLowT.com. The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is it Low T' Quiz." The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone including "Have you experienced a recent deterioration in your ability to play sports?", "Are you falling asleep after dinner?", "Are you sad and/or grumpy?", and "Do you have a lack of energy?"

38.     Dr. John Morley, director of endocrinology and geriatrics at the St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company Organon BioSciences, in exchange for a $40,000 grant to his university. The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy." Dr. Morely drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type up. Dr. Morely admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal." This is the "Low T Quiz" used on the "IsItLowT" website. Natasha Singer, Selling that New-Man Feeling, Nov. 23, 2013, N.Y. TIMES.

39.     Since the FDA approved Axiron, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

40.     While running its disease awareness campaign, Defendants promote their product as an easy to use topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

41.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

COMPLAINT FOR DAMAGES

42.    Defendants successfully created a robust and previously nonexistent market for their drug. For example, Axiron's website describes hypogonadism as
a condition in which a man has low T and may experience symptoms, including:
- Decreased sexual desire (libido)
- Erectile dysfunction
- Fatigue and loss of energy
- Depressed mood
- Loss of body hair (decreased need to shave)
- Decrease in strength
- Osteoporosis (decreased bone density)

The Axiron website goes on to state that "A simple blood test can be used to determine if you have low T." *See* Low Testosterone Information, Low T – AXIRON (testosterone) topical solution, available at http://www.axiron.com/low-testosterone-information.aspx (last visited May 8, 2014).

43.    Axiron aloo benefitted from the media campaign of fellow testosterone replacement therapy manufacturer Abbott Laboratories, which spent $80 million promoting its AndroGel prescription testosterone in 2012. The company also spent millions on its unbranded marketing including commercials and its websites, www.IsItLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

44.    Defendants' advertising paid off in a return of over a billion in sales during the past year, making Axiron the second biggest selling androgen drug in the United States after AndroGel. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, Are Testosterone Drugs the Next Viagra?, May 10, 2012, Bloomberg BusinessWeek, available at: http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

45.    In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. See Singer, Selling That New-Man Feeling, supra; See also, Larry Dobrow, All-star large pharma marketing team of the year: Androgel. Jan. 2, 2013, Medical

9

COMPLAINT FOR DAMAGES

1  Marketing & Media, available at: http://www.mmm-online.com/all-star-large-pharmamarketing-
2  team-of-the-year-androgel/article/273242/.

3      46.    The marketing program sought to create the image and belief by consumers and
4  physicians that low testosterone affected a large number of men in the United States and that the
5  use of prescription testosterone is safe for human use, even though Defendants knew these
6  statements to be false, and even though Defendants had no reasonable grounds to believe them to
7  be true.

8      47.    As part of their marketing campaign, Defendants promoted Axiron as easy to
9  apply for testosterone replacement therapy. Defendants promote their product as "the only
10 UNDERARM low T treatment." *See* Low Testosterone, Low T – AXIRON (testosterone) topical
11 solution, available at http://www.axiron.com (last visited May 8, 2014).

12 **FALSE AND MISLEADING MARKETING AND PROMOTIONS**

13     48.    Defendants successfully marketed prescription testosterone by undertaking a
14 "disease awareness" marketing campaign. This campaign sought to create a consumer perception
15 that low testosterone is prevalent among U.S. men and that symptoms previously associated with
16 other physical and mental conditions, such as aging, stress, depression, and lethargy are actually
17 attributable to "Low-T."

18     49.    Marketing practices included ghostwriting by professional medical writers to craft
19 messages for physicians and consumers of "low T" products. Articles in the Journal of the
20 American Medical Association's *Internal Medicine* described how a prescription testosterone
21 maker paid "for the creation of apparently objective physician or consumer education media
22 products," including cutting the following cautionary sentences from a monograph Stephen R.
23 Braun had written regarding testosterone replacement therapy:

24     It is worth noting that the quality of the evidence on which current clinical
       guidelines for TRT are based is low or very low, and that similar guidelines about
       the alleged benefits of hormone therapy for post-menopausal women have been
25     questioned after high-quality studies of sufficient size and duration were carried
       out.[]

26     Composite measures of T levels and the symptoms related to low
       circulating androgens are likely to be fluid and lack stability over long periods of
27     time. This suggests that Symptomatic Androgen Deficiency (SAD) represents a
       transient, rather than a permanent, state for the majority of the general male
28     population and may cast doubt on the use of SAD or similar constructs as proxies
       for true age-related hypogonadism.[]

29

10

COMPLAINT FOR DAMAGES

1  Stephen R. Braun, "Promoting 'Low T': A Medical Writer's Perspective, *JAMA Internal*
2  *Medicine*, 173(15), August 12/26, 2013.

3      50.     Defendants' advertising program sought to create the image and belief by
4  consumers and their physicians that the use of prescription testosterone was a safe method of
5  alleviating their symptoms that had few side effects and would not interfere with their daily lives,
6  even though Defendants knew or should have known these statements to be false, and even
7  though the Defendants had no reasonable grounds to believe them to be true.

8      51.     Defendants purposefully downplayed, understated and outright ignored the health
9  hazards and risks associated with using prescription testosterone. Defendants deceived potential
10  prescription testosterone users by relaying positive information through the press, including
11  testimonials from retired professional athletes, and manipulating hypogonadism statistics to
12  suggest widespread disease prevalence, while downplaying known adverse and serious health
13  effects.

14      52.     Defendants concealed material relevant information from potential prescription
15  testosterone users and minimized user and prescriber concern regarding the safety of prescription
16  testosterone.

17      53.     In particular, in the warnings Defendants give in their commercials, online and
18  print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and
19  falsely represent that Defendants adequately tested prescription testosterone for all likely side
20  effects.

21      54.     As a result of Defendants' advertising and marketing, and representations about
22  its product, men in the United States pervasively seek out prescriptions for Axiron. If Plaintiff
23  John Nagel had known the risks and dangers associated with Axiron, he would not have taken
24  Axiron and consequently would not have been subject to its serious side effects.

25                          **PLAINTIFF-SPECIFIC ALLEGATIONS**

26      55.     Plaintiff John Nagel was 55 years old when he was prescribed Axiron and used
27  the product as directed beginning in 2011 until May 9, 2012.

28      56.     Plaintiff used prescription testosterone to treat symptoms he and his health care
29  providers attributed to low testosterone as a result of Defendants' advertisements and promotion.

COMPLAINT FOR DAMAGES

57.     Plaintiff suffered deep vein thrombosis on May 9, 2012. As a result of this injury, Plaintiff was hospitalized for five days. Plaintiff was also prescribed a regimen of blood thinning medications as part of anti-coagulation therapy which requires him to limit his physical activities to reduce the risk of injury and bleeding.

58.     Plaintiff used Axiron manufactured, marketed, sold, promoted, and/or distributed by Defendants. Axiron used by Plaintiff were supplied by Defendant McKesson. The prescription testosterone reached Plaintiff without substantial change in the drug's condition.

59.     At all relevant times, Defendants had knowledge that there was a significant increased risk of adverse events associated with Axiron, and despite this knowledge Defendants continued to manufacture, market, distribute, sell, and profit from sales of Axiron.

60.     Despite such knowledge, Defendants knowingly, purposely and deliberately failed to adequately warn Plaintiff, patients, consumers, medical providers and the public of the increased risk of serious injury associated with using Axiron, including but not limited to death, cardiovascular events, stroke, and thrombotic events.

61.     Plaintiff's prescribing physician may not have prescribed Axiron to Plaintiff had Defendants provided said physician with an appropriate and adequate warning regarding the risks associated with the use of Axiron.

62.     Plaintiff's prescribing physician may have changed the way in which the physician treated Plaintiff's relevant condition, warned Plaintiff about the signs and symptoms of serious adverse effects of Axiron, and discussed the true risks of heart attack, stroke, and other serious adverse events, had Defendants provided said physician with an appropriate and adequate warning regarding the risks associated with the use of Axiron..

63.     As a direct and proximate result of Defendants' negligence, omissions, misrepresentations, failure to warn, willful and intentional acts, and other culpable conduct, Plaintiff suffered significant injuries from the use of Axiron, including severe and permanent bodily injury, pain and suffering, disability, mental anguish and loss of capacity for the enjoyment of life, and the expense of medical and nursing care.

12

COMPLAINT FOR DAMAGES

64.     Had Plaintiff known the true risks associated with the use of prescription testosterone, including Axiron, he would not have incurred the injuries or damages he did as a result of his use of Axiron.

65.     Plaintiff Cheryl Nagel is the wife of Plaintiff John Nagel, they were married at all times relevant to this complaint. As a direct and proximate result of Defendants' negligence, omissions, misrepresentations, failure to warn, willful and intentional acts, and other culpable conduct, Plaintiff suffered loss of affection, solace, companionship, society, assistance, and sexual relations due to the injuries her husband sustained.

66.     Defendants' conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish and deter similar conduct in the future.

## V.     **DELAYED DISCOVERY**

67.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from the Plaintiffs and Plaintiff John Nagel's physicians and healthcare providers the true and significant risks associated with prescription testosterone, including Axiron.

68.     As a result of Defendants' actions, Plaintiffs and Plaintiff John Nagel's physicians and healthcare providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff John Nagel had been exposed to the risks identified in this Complaint, and that those risks were the result of Defendants' acts, omissions, and misrepresentations.

69.     Plaintiffs first learned of the risks associated with Axiron and Defendants' concealment of those risks in 2014, when Plaintiffs first saw television advertisement about litigation involving the use of prescription testosterone in men.

70.     No limitations period ought to accrue until such time as Plaintiffs knew or reasonably should have known of some causal connection between the use of Axiron and the harm suffered as a result. As such, Plaintiffs hereby invoke the discovery rule based on the fact that this Complaint is filed well within the statutory period after Plaintiff knew or should have known the facts alleged herein.

71.     Additionally, the accrual and running of any applicable statute of limitations has been tolled by reason of Defendants' fraudulent concealment.

72.     Additionally, each Defendant is equitably estopped from asserting any limitations defense by virtue of its fraudulent concealment and other misconduct as described in this Complaint.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### STRICT LIABILITY: DESIGN DEFECT

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

73.     At all relevant and material times, the Defendants designed, manufactured, packaged, marketed, advertised, promoted, distributed, and sold prescription testosterone placing the products into the stream of commerce.

74.     At all relevant and material times, prescription testosterone was designed, manufactured, packaged, marketed, advertised, promoted, distributed, and sold by Defendants in a defective and unreasonably dangerous condition.

75.     Prescription testosterone was expected to reach, and did reach, users and consumers, including Plaintiff, without substantial change in their defective and unreasonably dangerous condition.

76.     Prescription testosterone was used by Plaintiff in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

77.     Prescription testosterone was defective and unreasonably dangerous when each product entered the stream of commerce in one or more of the following ways:

    a.   They contained defects in that the each product caused and/or increased the risk of experiencing an adverse event, including but not limited to heart attack, stroke, and death.

    b.   They were not safe because the health risks associated with each product outweighed the benefits.

COMPLAINT FOR DAMAGES

c.   They were marketed and promoted for use when they carried an unreasonable and unnecessary risk of serious injury.

d.   They were insufficiently and/or inadequately tested by Defendants.

e.   They were not safe due, in part, to inadequate and defective instructions and inadequate and defective warnings provided by Defendants.

f.   They were unreasonably dangerous in that, as designed, the risks of serious injury posed by using the products exceeded any benefits the products were designed to or might in fact bestow.

g.   They were defective in design in that the products neither bore, nor were packaged with, nor were accompanied by, warnings adequate to alert users, including Plaintiff, of the increased risks associated with using the products, including, but not limited to, the risk of serious injury.

h.   They were not accompanied by adequate warnings and instructions for use that included adequate information to fully apprise users, consumers, and the medical, pharmaceutical and scientific communities of the potential risks and serious side effects associated with using the products.

i.   They were unsafe for normal or reasonably anticipated use. Said products were defective and unreasonably dangerous in design, construction and/or composition.

j.   They were defective and unreasonably dangerous because the products did not conform to an express warranty of the manufacturer about the product.

k.   They were defective and unreasonably dangerous due to inadequate warnings, inadequate clinical trials, testing and study, and inadequate reporting regarding the results of the clinical trials, testing and study.

78.   Prescription testosterone as manufactured and supplied by the Defendants were defective due to inadequate warnings and instructions because, after Defendants knew or should have known of the risk of injuries from use, Defendants failed to provide adequate warnings to the medical community and the consumers to whom the drugs were directly marketed and advertised; and, further, Defendants continued to affirmatively promote prescription testosterone as safe and effective.

15

COMPLAINT FOR DAMAGES

79.     A reasonable person who had actual knowledge of the increased risks associated with using prescription testosterone would have concluded that prescription testosterone should not have been marketed to or used.

80.     Despite the fact that Defendants knew or should have known of the defective nature of Axiron, Defendants continued to design, manufacture and sell Axiron so as to maximize sales and profits at the expense of the public health and safety.  Defendant thus acted with conscious and deliberate disregard of the foreseeable harm caused by Axiron.

81.     Plaintiff and the non-defendant health care providers involved could not, through the exercise of reasonable care, have discovered the risk of serious injury associated with and/or caused by Axiron.

82.     Plaintiff was not aware of the aforementioned defects at any time prior to the injuries caused by Axiron.

83.     Had adequate information regarding the safety of the products been provided to Plaintiff, Plaintiff would not have used Axiron.

84.     Defendants acted with conscious and/or deliberate disregard of the foreseeable harm caused by use of their products.

85.     As a direct and proximate consequence of Defendants negligence, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory, exemplary and punitive damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION – NEGLIGENCE

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

86.     Defendants negligently manufactured, designed, labeled, packaged, distributed, marketed, advertised, promoted, and sold Axiron.

87.     At all relevant and material times, Defendants had a duty to Plaintiff to exercise reasonable care in the design, manufacture, advertising, marketing, labeling, packaging,

16

COMPLAINT FOR DAMAGES

distribution, post-market safety monitoring, reporting of adverse events, and sale of Axiron, including a duty to ensure that the products did not cause users such as Plaintiff to suffer from unreasonable, dangerous side effects when used alone or in foreseeable combination with other drugs.

88.    Defendants breached their duty of care to Plaintiff and were negligent in their actions, misrepresentations, and omissions in numerous ways including the following:

a.   Failing to perform adequate testing concerning the safety of Axiron which would have shown Axiron posed a serious risk of death, cardiovascular events, stroke, thrombotic events, and other adverse effects which would have permitted adequate and appropriate warnings to have been by given by Defendants to prescribing physicians and the consuming public, including Plaintiff;

b.   Failing to design Axiron so as to properly minimize effects on receptors that were known to be associated with certain serious adverse effects;

c.   Failing to develop Axiron properly so as to minimize the proliferation of new uses for which there was little or no scientific evidence of safety and efficacy;

d.   Failing to conduct adequate pre-clinical and clinical testing to determine the safety of Axiron, including failing to adequately train clinical investigators as to the risks and benefits of Axiron and as to proper methods of monitoring patients;

e.   Failing to report to the FDA, the medical community, and the general public those data resulting from pre- and post-marketing tests of Axiron which indicated risks associated with using the products;

f.   Failing to conduct adequate post-market monitoring and surveillance of Axiron and analysis of adverse event reports;

g.   Designing, manufacturing, marketing, advertising, distributing, and selling Axiron to consumers, including Plaintiff, without an adequate warning of risks associated with using the products and without proper and adequate instructions to avoid the harm which could foreseeably occur as a result of using the products;

h.   Failing to exercise due care when advertising, promoting, and selling Axiron;

17

i. Failing to use due care in the preparation, design and development of Axiron to prevent, avoid, or minimize the risk of injury to individuals when the products were used;

j. Failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers, the medical community, and the FDA;

k. Failing to accompany Axiron with proper warnings regarding all possible risks associated with using the products;

l. Failing to use due care in the manufacture, inspection, and labeling of Axiron to prevent risk of injuries to individuals who used the products;

m. Failing to provide adequate and accurate training and information to the sales representatives who sold the products;

n. Failing to conduct sales of Axiron properly in that Defendants' sales representatives made false and misleading statements to prescribers concerning approved and unapproved uses, risks and benefits of Axiron;

o. Failing to educate healthcare providers and the public about the safest use of the products;

p. Failing to give healthcare providers adequate information to weigh the risks of serious injury associated with the products;

q. Failing to test and inspect Axiron in a reasonable manner in order to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured, and sold;

r. Failing to warn Plaintiff of the danger of adverse medical conditions from the use of Axiron;

s. Failing to label Axiron to adequately warn Plaintiff of the serious adverse side effects with the use of Axiron; and

t. Failing to refrain from illegal off-label marketing.

89. Defendants advertised, promoted, marketed, sold and distributed Axiron despite the fact that Defendants knew or should have known of the increased risks associated with using

18

COMPLAINT FOR DAMAGES

the products, including but not limited to death, cardiovascular events, stroke, thrombotic events, and other adverse events of which Plaintiff and his healthcare providers would not have been aware.

90.     Defendants, individually and collectively, had a duty to warn the FDA, their customers, the medical community and the public about the increased risks of injury but failed to do so.

91.     Defendants are guilty of negligence per se in that the Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, et seq., and the Sherman Food, Drug and Cosmetic Law, as well as other applicable laws, statutes, and regulations.

    a.     The Defendants' acts and omissions, including but not limited to Defendants' off-label marketing, constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.* Persons such as Plaintiff were the parties intended to be protected by such legislation and whose injuries said regulations were designed to prevent. Defendants' conduct was a proximate cause of Plaintiff's injury.

    b.     The Defendants' also failed to report adverse events as required by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.* Persons such as Plaintiff were the parties intended to be protected by such legislation and whose injuries said regulations were designed to prevent. Defendants' conduct was a proximate cause of Plaintiff's injury.

92.     Despite the fact that Defendant knew or should have known that Axiron increased the risk of serious injury including but not limited to heart attack, stroke, and other adverse effects, Defendant continued to manufacture, market, advertise, sell and distribute Axiron to consumers, including Plaintiff.

93.     Defendants negligently and recklessly represented to Plaintiff, physicians, and other persons and professionals Defendants knew would justifiably rely on the representations, that Axiron was safe to use and that the utility of the products outweighed any risk in use for their intended purposes.

19

COMPLAINT FOR DAMAGES

94. Defendants negligently and recklessly failed to disclose to Plaintiff and others important safety and efficacy information about Axiron, thereby suppressing material facts while under a duty to disclose such information.

95. Defendants' representations about the safety and adverse side effects of Axiron was negligently and recklessly made in that Axiron in fact caused injury, was unsafe, and the benefits of its use far outweighed by the risk associated with use thereof.

96. Defendants knew or should have known that their representations and omissions were false. Defendants made such false, negligent and reckless representations and omissions with the intent or purpose that Plaintiff and any non-defendant physicians would rely upon such representations, leading to the use of Axiron as described.

97. Defendants omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of Axiron including serious injury. Furthermore, Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of Axiron.

98. At the time Defendants made these misrepresentations and/or omissions, they knew or should have known that Axiron was unreasonably dangerous and not what Defendants had represented to Plaintiff, as well as the medical community, the FDA and the consuming public.

99. Defendants' misrepresentations and/or omissions were undertaken with an intent that doctors and patients, including Plaintiff, rely upon them.

100. Plaintiff and his healthcare providers did not know that these representations were false and justifiably relied on and were induced by Defendants' misrepresentations, omissions, and/or active concealment of the dangers of Axiron to employ these products.

101. Had Plaintiff been aware of the increased risk of side effects associated with Axiron and the relative efficacy of Axiron compared with other readily available products, Plaintiff would not have used these products.

102. As a direct and proximate consequence of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, Plaintiff suffered the injuries and damages alleged herein.

20

COMPLAINT FOR DAMAGES

1    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory,

2    exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and

3    such other and further relief as this Court deems just and proper.

4                              **THIRD CAUSE OF ACTION**

5                        **STRICT LIABILITY: FAILURE TO WARN**

6          Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint

7    as though set forth in full in this cause of action, and further alleges:

8          103.    Axiron is unreasonably dangerous, even when used in a foreseeable manner as

9    designed and intended by Defendants.

10         104.    Defendants failed to warn and/or adequately warn Plaintiff, consumers,

11   physicians, and healthcare professionals of the increased health risks associated with using

12   Axiron.

13         105.    Plaintiff did not have the same knowledge as Defendants and no adequate

14   warning was communicated to him.

15         106.    Defendants had a continuing duty to warn consumers and healthcare professionals

16   of increased health risks associated with its products, and negligently and/or wantonly breached

17   its duty as follows:

18         a.  Failed to include warnings and/or adequate warnings of the increased risks of

19             serious injury associated with using Axiron including but not limited to adverse

20             cardiovascular effects;

21         b.  Failed to provide adequate and proper instructions regarding the proper use of

22             Axiron to prevent heart attack, stroke, and other adverse effects;

23         c.  Failed to provide adequate and/or proper instructions regarding the need for

24             diagnostic tests to be performed on the patient prior to and during use of Axiron

25             to discover and ensure against serious and potentially fatal side effects including

26             but not limited to heart attack, stroke, and other adverse effects;

27         d.  Failed to inform Plaintiff that Axiron had not been adequately tested to determine

28             the safety and risks associated with using the products;

29

                                        21
                            COMPLAINT FOR DAMAGES

e.  Failed to warn that the risks associated with the use of Axiron exceeded the risks of other available forms of treatment for Plaintiff's condition, including the risks of heart attack, stroke, and other adverse effects; and

f.  Failed to report adverse events to the FDA associated with the application of Axiron.

107.  Defendants and each of them had a duty to warn the FDA, the medical community, Plaintiff, and Plaintiff's physicians about the increased risks of injury but failed to do so.

108.  As a direct and proximate result of the actions and inactions of Defendants as set forth above, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

109.  Defendants expressly represented to Plaintiff, consumers and the medical community that Axiron was:

a.  safe;

b.  efficacious;

c.  of merchantable quality;

d.  adequately tested;

e.  well tolerated in adequate and well-controlled clinical studies; and

f.  did not increase the risk of experiencing serious, life threatening side effects.

110.  Defendants breached the express warranties as follows:

a.  Defendants misrepresented the safety of Axiron in the products' labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions;

COMPLAINT FOR DAMAGES

b.  Defendants misrepresented the risks associated with using Axiron;

c.  Defendants withheld and/or concealed and/or downplayed the information and/or evidence that the products were associated with an increased risk of serious injury;

d.  Defendants misrepresented that Axiron was as safe or safer than other available forms of treatment for Plaintiff's condition; and

e.  Defendants fraudulently concealed information about the safety of Axiron, including information that the products were not safer than other available forms of treatment for Plaintiff's condition.

111.  Axiron did not conform to Defendants' express representations and warranties.

112.  At all relevant times, Axiron did not perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.

113.  At all relevant times, Axiron did not perform in accordance with the Defendants' representations because Axiron is not safe and cause high levels of serious side effects.

114.  In deciding to purchase and use Axiron, Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

115.  As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

116.  At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold Axiron.

117.  Defendants impliedly warranted to Plaintiff that Axiron was safe for use by Plaintiff and the consuming population.

23

COMPLAINT FOR DAMAGES

118.     Defendants knew of the use for which Axiron was intended and impliedly warranted Axiron to be of merchantable quality and safe and fit for their intended use.

119.     Plaintiff and his healthcare providers used Axiron as intended and directed by the Defendants and in a foreseeable manner as intended, recommended, promoted, and marketed by Defendants.

120.     Plaintiff was a foreseeable user of Defendants' products, Axiron.  Axiron was expected to reach and did in fact reach Plaintiff, without substantial change in the condition in which the products were manufactured and sold by Defendants.

121.     Plaintiff and his healthcare providers reasonably relied upon the expertise, skill, judgment and knowledge of Defendants and upon the Defendants' implied warranty that Axiron was safe, of merchantable quality, and fit for use.

122.     The Axiron used by Plaintiff was not safe, of merchantable quality, nor fit for use.

123.     The Axiron used by Plaintiff did not perform in accordance with Defendants' representations because Axiron is not safe and cause high levels of serious, life-threatening side effects.

124.     Defendants breached the implied warranty in that Axiron did not conform to Defendants' representations.

125.     As a direct and proximate result of the breach of warranty of merchantability and the warranty of fitness by Defendants, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

### SIXTH CAUSE OF ACTION

### FRAUD: MISREPRESENATION

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

126.     At all relevant and material times, Defendants falsely and fraudulently represented to Plaintiff's physicians, and through them, to Plaintiff and members of the general

COMPLAINT FOR DAMAGES

public, that Axiron products were safe to treat low testosterone, that they had few side effects, and would not interfere with their daily lives.

127.    Defendants' superior knowledge and expertise, relationship of trust and confidence with doctors and the public, specific knowledge regarding the risks and dangers of Axiron, and intentional dissemination of promotional and marketing information about Axiron for the purpose of maximizing sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about the risks and harms associated with the products.

128.    Defendants fraudulently represented to Plaintiff, physicians, and other persons and professionals whom Defendants knew would justifiably rely on Defendants' representations, as well as the public at large, that Axiron was safe and effective for use in treating Plaintiff's conditions.

129.    Defendants intentionally failed to disclose to Plaintiff and others important safety, risk, adverse event and injury information, including but not limited to the increased risk of heart attack, stroke, and other adverse effects. Defendants suppressed material facts about the products while having a duty to disclose such information, which duty arose, in part, from the Defendants designing, manufacturing, marketing, advertising, distributing and selling such products.

130.    Defendants' false representations were fraudulently made, with the intent or purpose that Plaintiff and healthcare providers involved in providing treatment to Plaintiff would justifiably rely upon them, leading to the use of Axiron.

131.    Defendants' deliberate misrepresentations and/or concealment, suppression, and omission of material facts as alleged herein, include, but are not limited to:

    a.  Making false and misleading claims regarding the known risks of Axiron and suppressing, failing to disclose and mischaracterizing the known risks of Axiron, including, but not limited to, stroke, heart attack, and death;

    b.  Misrepresenting or failing to timely and fully disclose the true results of clinical tests and studies related to Axiron;

25

COMPLAINT FOR DAMAGES

c. Issuing false and misleading warnings and/or failing to issue adequate warnings concerning the risks and dangers of using Axiron which would disclose the nature and extent of the harmful side effects of Axiron;

d. Making false and misleading claims that adequate clinical testing had been done and/or failing to disclose that adequate and/or generally accepted standards for pre-clinical and clinical testing had not been followed; and

e. Making false and misleading misrepresentations concerning the safety, efficacy and benefits of Axiron without full and adequate disclosure of the underlying facts which rendered such statements false and misleading.

132. Defendants willfully, wantonly, and recklessly disregarded their duty to provide truthful representations regarding the safety and risk of Axiron.

133. Defendants made these misrepresentations with the intent that doctors and patients, including Plaintiff, rely upon them.

134. Defendants' misrepresentations were made with the intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and encourage the sale of Axiron.

135. Defendants' fraudulent representations evidence their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

136. Defendants omitted, misrepresented, suppressed and concealed material facts concerning the dangers and risk of injuries associated with the use of Axiron including the increased risk of serious injury as well as the fact that the product was unreasonably dangerous.

137. Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of Axiron in order to increase sales.

138. Plaintiff and the treating medical community did not know that Defendants' representations were false and/or misleading and justifiably relied on them.

139. Defendants had sole access to material facts concerning the dangers and unreasonable risks of Axiron.

COMPLAINT FOR DAMAGES

140. The intentional concealment of information by Defendants about the substantial risks of serious injury associated with Axiron was known by Defendants to be wrongful.

141. Had Defendants not fraudulently concealed such information, Plaintiff would not have used Axiron.

142. Had Plaintiff been aware of the increased risks of serious injury associated with Axiron, Plaintiff would not have used Axiron.

143. As a direct and proximate consequence of Defendants' fraudulent and intentional misrepresentation, Plaintiff suffered the injuries and damages alleged herein.

144. WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees and such other, and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

## FRAUD: CONCEALMENT

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

145. At all relevant and material times, Defendants had the duty and obligation to disclose to Plaintiff's physicians, and through them, to Plaintiff and members of the general public, the fact that Axiron is dangerous and defective as well as the likelihood of serious consequences to Plaintiff and other users and the level of risk involved in prescribing testosterone for the purpose indicated. Defendants made affirmative representations set forth above to Plaintiff and Plaintiff's health care providers and the general public prior to the day Plaintiff was first prescribed and used Axiron while concealing material facts.

146. Defendants had the duty and obligation to disclose to Plaintiff and Plaintiff's health care providers the facts concerning Axiron, including that the use of and exposure to Axiron could cause severe injuries, including but not limited to life-threatening cardiac events, strokes, and thrombotic events. At all times mentioned in this Complaint, Defendants, and their predecessors and successors in interest, intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Plaintiff and Plaintiff's health care providers with the intent to defraud.

COMPLAINT FOR DAMAGES

147.    Neither Plaintiff nor Plaintiff's health care providers were aware of the facts set forth above. Had Defendants not concealed such information, Axiron would not have been used to treat Plaintiff.

148.    Had Plaintiff or his health care providers been made aware of the increased risks of serious injury associated with Axiron, Plaintiff would not have used Axiron.

149.    Defendants' concealment of material facts was malicious, wanton, oppressive, and fraudulent such that it evidenced a willful and conscious disregard of the rights and safety of others.

150.    As a direct and proximate consequence of Defendants' intentional concealment of facts, upon which Plaintiff and Plaintiff's health care providers reasonably relied, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees and such other, and further relief as this Court deems just and proper.

### EIGHTH CAUSE OF ACTION

### FRAUD: NEGLIGENT MISREPRESENTATION

Plaintiff John Nagel incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action and further alleges:

151.    Prior to Plaintiff's first dose of Axiron, and during the period in which Plaintiff used Axiron, Defendants misrepresented the degree to which Axiron provided a safe and effective treatment.

152.    Defendants failed to disclose material facts regarding the safety and efficacy of Axiron, including information regarding increased adverse events and harmful side-effects.

153.    Defendants had a duty to provide Plaintiff, physicians, and other patients with true and accurate information and warnings of any known risks and side-effects associated with the Axiron products they marketed, distributed, and sold.

154.    Defendants knew or should have known, based on prior experience, adverse event reports, studies and knowledge of the efficacy and safety failure associated with Axiron that their

COMPLAINT FOR DAMAGES

1    representations regarding these drugs were false, and that they had a duty to disclose the dangers
2    of Axiron.

3    155.    Defendants made the representations and otherwise failed to disclose material
4    facts concerning Axiron with the intent to induce patients, including Plaintiff, to act in reliance
5    thereon in using Axiron during the course of their treatment.

6    156.    Plaintiff justifiably relied on Defendants' representations and non-disclosures in
7    choosing to use Axiron.

8    157.    As a direct and proximate consequence of Defendants' negligence, willful,
9    wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, Plaintiff
10   suffered the injuries and damages alleged herein.

11   WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory,
12   exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and
13   such other and further relief as this Court deems just and proper.

14   **NINTH CAUSE OF ACTION**
15   **LOSS OF CONSORTIUM**

16   158.    Plaintiff Cheryl Nagel realleges each and every allegation of this Complaint in
17   each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set
18   forth herein.

19   159.    Plaintiffs are entitled to the comfort, enjoyment, society and services of their
20   spouses.

21   160.    As a direct and proximate result of the foregoing, Plaintiff Cheryl Nagel was
22   deprived of the comfort and enjoyment of the services and society, and has suffered and will
23   continue to suffer economic loss, and have otherwise been emotionally and economically
24   injured. Plaintiff's injuries and damages are permanent and will continue into the future. Plaintiff
25   seeks actual and punitive damages form the Defendants as alleged herein.

26   161.    For the reasons set forth herein, Plaintiff Cheryl Nagel will continue to suffer the
27   loss of her loved one's support, companionship, services, society, love and affection.

28
29

29

COMPLAINT FOR DAMAGES

1    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory,

2    exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and

3    such other and further relief as this Court deems just and proper.

4    <u>**PUNITIVE DAMAGES ALLEGATIONS**</u>

5    Plaintiffs incorporate by reference each and every paragraph of this Complaint as though

6    set forth in full and further alleges:

7    162.    The acts, conduct, and omissions of Defendants, as alleged throughout this

8    Complaint were willful and malicious. Defendants committed these acts with a conscious

9    disregard for the rights of Plaintiffs and other Axiron users and for the primary purpose of

10   increasing Defendants' profits from the sale and distribution of Axiron. Defendants' outrageous

11   and unconscionable conduct warrants an award of exemplary and punitive damages against

12   Defendants in an amount appropriate to punish and make an example of Defendants.

13   163.    Prior to the manufacturing, sale, and distribution of Axiron, Defendants knew that

14   said medication was in a defective condition as previously described herein and knew that those

15   who were prescribed the medication would experience and did experience severe physical,

16   mental, and emotional injuries. Further, Defendants, through their officers, directors, managers,

17   and agents, knew that the medication presented a substantial and unreasonable risk of harm to the

18   public, including Plaintiffs and as such, Defendants unreasonably subjected consumers of said

19   drugs to risk of injury or death from using Axiron.

20   164.    Despite their knowledge, Defendants, acting through their officers, directors and

21   managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately

22   failed to remedy the known defects in Axiron and failed to warn the public, including Plaintiffs,

23   of the extreme risk of injury occasioned by said defects inherent in Axiron. Defendants and their

24   agents, officers, and directors intentionally proceeded with the manufacturing, sale, and

25   distribution and marketing of that Axiron knowing these actions would expose persons to serious

26   danger in order to advance Defendants' pecuniary interest and monetary profits.

27   165.    Defendants' conduct was despicable and so contemptible that it would be looked

28   down upon and despised by ordinary decent people, and was carried on by Defendants with

29

38

willful and conscious disregard for the safety of Plaintiffs, entitling Plaintiffs to exemplary damages.

WHEREFORE, Plaintiffs demand judgment against Defendants and seeks compensatory, exemplary and punitive damages, together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## GLOBAL PRAYER FOR RELIEF

Plaintiffs incorporate by reference each and every paragraph of this Complaint as though set forth here in full and further prays:

166.    So far as the law and this Court allows, Plaintiffs demand judgment against each Defendant on each count as follows:

- Compensatory damages for the described losses with respect to each cause of action;
- Past medical expenses;
- Past and future lost wages and loss of earning capacity;
- Past and future emotional distress;
- Consequential damages;
- Disgorgement of profits obtained through unjust enrichment;
- Restitution;
- Punitive damages with respect to each cause of action;
- Reasonable attorneys' fees where recoverable;
- Costs of this action;
- Pre-judgment and all other interest recoverable; and
- Such other additional and further relief as Plaintiffs may be entitled to in law or in equity.

Dated:  May 9, 2014

By: _____
Eric H. Gibbs
Amy M. Zeman
Phyra M. McCandless
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800

31

COMPLAINT FOR DAMAGES

39

Facsimile: (415) 981-4846

Michael Danko
Kristine K. Meredith
**DANKO MEREDITH**
333 Twin Dolphin Dr., Ste 145
Redwood City, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672

Norman E. Siegel
Todd E. Hilton
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: May 9, 2014          By: _____

Eric H. Gibbs
Amy M. Zeman
Phyra M. McCandless
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Michael Danko
Kristine K. Meredith
**DANKO MEREDITH**
333 Twin Dolphin Dr., Ste 145
Redwood City, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672

Norman E. Siegel
Todd E. Hilton
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

32

COMPLAINT FOR DAMAGES

**EXHIBIT B**

Case: 1:14-cv-04528 Document #: 1 Filed: 05/12/14 Page 43 of 53 PageID #:43

In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, Not Reported in...

2013 WL 656822
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

In re PRADAXA (DABIGATRAN ETEXILATE)
PRODUCTS LIABILITY LITIGATION.
This Document Relates to:
Thelma Butner, Clifton Fitzsimmons,
John Wilchinski, George Fletcher,
and Pauline Aldridge, Plaintiffs,

v.

Boehringer Ingelheim Pharmaceuticals,
Inc., Boehringer Ingelheim Fremont, Inc.,
Boehringer Ingelheim Pharma GmbH & Co.
KG, Boehringer Ingelheim International
GmbH, Bidachem S.P.A., McKesson
Corporation and Does 1–100, Defendants.

MDL No. 2385.  |  No. 3:12–md–
02385–DRH–SCW.  |  Feb. 22, 2013.

Opinion

### ORDER DISMISSING FRAUDULENTLY JOINED DEFENDANTS AND DENYING REMAND

HERNDON, Chief Judge.

### I. INTRODUCTION

**\*1** One of the defendants, Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI"), removed this action to federal court on the basis of diversity jurisdiction (Doc. 1). BIPI contends complete diversity exists because the two nondiverse defendants, Boehringer Ingelheim Fremont, Inc. ("BIF") and McKesson Corporation ("McKesson"), were fraudulently joined. Presently, before the Court is the plaintiffs' motion to remand to state court (Doc. 14). The plaintiffs allege various procedural defects in BIPI's notice of removal and contend they have asserted viable claims against the two nondiverse defendants. *Id.* BIPI filed a responsive pleading on January 2, 2013 (Doc. 27). Thereafter, on January 17, 2013, the plaintiffs filed a reply brief (Doc. 28).[1]

### II. BACKGROUND

The plaintiffs are citizens of California, Tennessee, and Louisiana (Doc. 1 ¶¶ 17–21). On May 23, 2012, the plaintiffs filed a complaint in the Superior Court of the State of California for the County of San Francisco (Doc. 1–1). The plaintiffs' complaint asserts twelve causes of action arising from the alleged ingestion of the prescription drug Pradaxa and names six defendants (Doc. 1–1).[2] McKesson and BIF are both citizens of California and are the only non-diverse defendants.

On July 16, 2012, after the plaintiffs' complaint was filed in state court but prior to service of process on any defendant, BIPI removed the case to the U.S. District Court for the Northern District of California on the basis of diversity jurisdiction (Doc. 1).[3] In removing the action, BIPI did not obtain the consent of the other named defendants. BIPI's notice of removal states that BIPI did not need to obtain the consent of the other named defendants because, at the time of removal, no defendant had been served (Doc. 1 ¶ 7). In addition, BIPI's notice of removal states it was not required to obtain the consent of BIF or McKesson because both defendants were fraudulently joined. *Id.*

On December 7, 2012, the case was transferred from the Northern District of California to this Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Presently before the Court is the plaintiffs' motion to remand to state court (Doc. 14). The plaintiffs raise several procedural objections regarding BIPI's notice of removal, including the following: (1) the removal is premature because it was filed prior to service on any defendant; (2) the removal is improper because BIPI did not obtain the consent of the other defendants; and (3) the removal violates the fraudulent joinder rule. The plaintiffs also contend that this Court lacks subject matter jurisdiction because they have asserted viable claims against the nondiverse defendants.

### III. ANALYSIS

#### A. Governing Authority

##### 1. Substantive State Law
In assessing whether a defendant has been fraudulently joined, a court considers whether the asserted claims have any chance of success under state substantive law. Accordingly,

In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, Not Reported in...

prior to conducting a fraudulent joinder analysis, a court must determine which state's substantive law is applicable. When a diversity case is transferred by the Multidistrict Litigation Panel (as is the case here), the transferee court applies the state laws that the transferor forum would have applied according to that forum's conflict of laws rules. *See In re Data General Corp. Antitrust Litigation,* 510 F.Supp. 1220, 1227–28 (J.P.M.L.1979) (*quoting In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975,* 407 F.Supp. 244, 246–47 (J.P.M.L.1976)); *Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732–735 (7th Cir.2010); *In re Air Crash Disaster Near Chicago,* 644 F.2d 594, 610 (7th Cir.1981).[4] Accordingly, in the instant case, the Court would apply California's "governmental interest" approach.[5] Because this case involves multiple plaintiffs and numerous theories of recovery, the Court would have to apply an individualized choice of law analysis to each plaintiff and each claim to determine which jurisdiction's substantive law governs the same. *See Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1188 (9th Cir.2001).[6]

**2. Federal Law**

**\*2** With regard to questions of federal law, the Court is governed by the law of the Seventh Circuit. *See McMasters v. U.S.* 260 F.3d 814, 820 (7th Cir.2001) (in general, the law of the circuit where the transferee court sits governs questions of federal law).[7] *See also Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126 (7th Cir.1993), cert. denied, 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994) (law of the transferor forum is only applied when the federal law in question is intended to be geographically non-uniform).

**3. District Court Decisions**

The Court reminds the parties that district court opinions have no precedential value and are not binding on this court. *See, e.g .,Howard v. Wal–Mart Stores, Inc.,* 160 F.3d 358, 359 (7th Cir.1998); *Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 697 (7th Cir.1998) little or no authoritative value"). Further, the undersigned judge has specific case management procedures relating to citation of federal trial courts:

> When parties or attorneys feel compelled to cite other federal trial courts as authority for a particular proposition of law, despite the complete lack of precedential authority thereof, the name of the

trial judge whose order is cited should be included with the citation. Furthermore, the exact purpose in citing the case should be included since it is presumed that it is not cited as binding precedent on this Court. If a subsequent Seventh Circuit opinion, for example, relies upon the case for a reason pertinent to the action at bar, this Court should be so advised.

Chief Judge David R. Herndon Case Management Procedures, p. 2 (available at http://www.ilsd.uscourts.gov/ documents/Herndon.pdf).

**B. Alleged Procedural Deficiencies**

**1. Timeliness of Removal**

The plaintiffs contend that, because the notice of removal was filed prior to the plaintiffs effecting service on *any* of the defendants, it was premature and thus untimely (Doc. 14 p. 11). The Court is not persuaded by this argument. Section 1446(b)(1) merely establishes the deadline or outer limit for a notice of removal, after which removal is untimely. *See* 28 U.S.C. § 1446(b)(1) ("The notice of removal of a civil action or proceeding *shall be filed within thirty days after the receipt by the defendant, through service or otherwise,* of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based[.]") (emphasis added). Nothing in section 1446(b)(1), or any other statute,[8] indicates that a defendant must formally receive the complaint before removing the case. Given the statute's clarity, it is not the Court's place to impose any such requirement.[9]

**2. Consent**

The plaintiffs argue the removal was defective because BIPI did not obtain the consent of the other defendants (Doc. 14 p. 12). The plaintiffs are correct in noting that the judicially created "rule of unanimity" generally requires all defendants to consent to removal. *See Chicago, Rock Island & Pac. Ry. Co. v. Martin,* 178 U.S. 245, 248, 20 S.Ct. 854, 44 L.Ed. 1055 (1900). Federal courts, however, uniformly recognize that fraudulently joined defendants and unserved defendants are not required to join in the removal.[10]

**\*3** Here, none of the defendants had been served at the time of removal. Accordingly, BIPI did not need to obtain the consent of the other defendants. Moreover, for the reasons

discussed below, the Court finds McKesson and BIF were fraudulently joined. As a result, BIPI did not need to obtain consent from McKesson or BIF.

### 3. Forum Defendant Rule

#### a. The forum defendant rule does not apply to fraudulently joined defendants

The "forum defendant rule," contained in 28 U.S.C. § 1441(b)(2), provides that a case may not be removed on the basis of diversity jurisdiction where one or more defendants is a citizen of the state in which the action is pending. *See* 28 U.S.C. § 1441(b)(2). In the instant case, the plaintiffs claim the forum defendant rule bars removal because BIF and McKesson are citizens of California, the state in which the action was brought (Doc. 28 pp. 5–7).

BIPI asserts the forum defendant rule is inapplicable because BIF and McKesson were fraudulently joined. The Court agrees. Section 1441(b)(2) provides that an action otherwise removable on diversity grounds "may not be removed if any of the parties in interest *properly* joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2) (emphasis added). Thus, pursuant to the plain language of the statute, removal is only prohibited when a *properly* joined and served resident defendant is present. A defendant that has been fraudulently joined to defeat diversity jurisdiction does not meet this requirement.[11] In the instant case, for the reasons discussed below, the Court finds that BIF and McKesson were fraudulently joined. As a result, the forum defendant rule is not applicable.

#### b. The requirement of complete diversity must be distinguished from the requirements of removability

The forum defendant rule is not applicable because BIF and McKesson were fraudulently joined. Accordingly, the Court need not resolve the parties' arguments with regard to service of process and the forum defendant rule. Nonetheless, the Court will take a moment to clarify an area of confusion that is evident from the plaintiffs' briefing.

BIPI contends that, even if the forum defendant rule were applicable, the presence of an unserved resident defendant would not bar removal. The plaintiffs insist that service is not a relevant consideration in assessing the propriety of removal under the forum defendant rule.[12] As support for their argument, the plaintiffs rely on a number of

decisions in which the defendants attempted to use lack of service as an exception to the requirement of complete *diversity*.[13] Reliance on these decisions demonstrates the plaintiffs are conflating section 1332's *diversity* requirement with the requirements of *removability* under the forum defendant rule. This is problematic because there is a crucial distinction between what is relevant in ascertaining diversity (a jurisdictional question) and what is relevant in ascertaining removability under section 1441(b)(2) (a procedural question).[14]

**\*4** Section 1332 provides a basis for original subject matter jurisdiction over actions between citizens of different states when the sum or value of the matter in controversy exceeds $ 75,000. 28 U.S.C. § 1332(a). The statute requires complete diversity, meaning "none of the parties on either side of the litigation may be a citizen of a state of which a party on the other side is a citizen." *Howell by Goerdt v. Tribune Entertainment Co.*, 106 F.3d 215, 217 (7th Cir.1997). If complete diversity exists, there is a jurisdictional basis for removal under 28 U.S.C. § 1441(a).

There is no question that the citizenship of all named defendants,[15] regardless of service, must be considered in determining whether diversity jurisdiction exists.[16] However, the forum defendant rule is a separate, nonjurisdictional inquiry with its own statutory requirements. The vast majority of courts considering those statutory requirements have concluded that, where diversity jurisdiction exists, the presence of an unserved forum defendant does not bar removal.[17] As the undersigned judge has explained in previous decisions:

nothing in 28 U.S.C. § 1441 [bars] removal in diversity cases when an unserved resident defendant is present. In fact, just the opposite: as that statute's language clearly provides, if diversity jurisdiction exists, only a "joined *and served"* resident prevents ... removal. Under the statute's plain language, therefore, if a resident defendant is not both joined and served, the forum defendant rule does not apply. *Massey v. Cassens & Sons, Inc.,* 05–0598–DRH (Feb. 16, 2006 Doc. 58 pp. 5–7) (Herndon, C.J.) (citations removed) (emphasis supplied). *See also Sheffer v. Cottrell, Inc., et al.,* 2009 WL 1231037, \*2–\*3 (S.D.Ill. Apr.30, 2009) (Herndon, C.J.).[18]

Therefore, the forum defendant rule does not bar removal when an unserved resident defendant is present. Moreover,

43

although diversity of citizenship is assessed without regard to service of process, this rule is not applicable in the instant case. Here, BIPI does not contend diversity exists because of lack of service. Rather, BIPI contends diversity exists because the forum defendants were fraudulently joined. Accordingly, the plaintiffs' extensive argumentation regarding service of process and the existence of diversity jurisdiction is not relevant.

## C. Fraudulent Joinder

### 1. Legal Standard

The doctrine of fraudulent joinder is an exception to section 1332's complete diversity requirement. *See Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992). Pursuant to the fraudulent joinder doctrine, a district court considering removal may "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 763 (7th Cir.2009). The doctrine of fraudulent joinder is triggered when a defendant demonstrates that, "after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992); accord, *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 764 (7th Cir.2009). Put another way, fraudulent joinder exists when a nondiverse defendant is "joined simply to defeat removal, as might be inferred from a demonstration that the claim against that defendant had no possible merit." *Walton v. Bayer Corp.,* 643 F.3d 994, 999 (7th Cir.2011).

**\*5** Generally, an evaluation of fraudulent joinder is limited to a review of the allegations in the complaint. However, the Seventh Circuit has held that courts may engage in the limited use of affidavits and similar evidence in assessing relevant jurisdictional facts. *See Faucett v. Ingersoll–Rand Mining & Machinery Co.,* 960 F.2d 653, 655 (7th Cir.1992). For example, in *Faucett,* the Seventh Circuit held a non-diverse defendant's uncontradicted affidavit, stating the defendant had nothing to do with the allegedly injurious product, established there was no possibility the plaintiff could state a claim against the non-diverse defendant. *Faucett,* 960 F.2d at 654–655.

### 2. Causation is a requisite element of the plaintiffs' claims

The gravamen of the plaintiffs' claims is that, as a result of the ingestion of Pradaxa, each plaintiff suffered various physical, economic and emotional injuries (Doc. 1–1 ¶¶ 11–18). Imposition of liability, under any of the plaintiffs' asserted theories of recovery, will require some causal relationship between the defendant's conduct and the plaintiffs' alleged injuries—regardless of which jurisdiction's substantive law governs the individual claims of each plaintiff. [19] This concept is aptly described in an ALR annotation on products liability:

Regardless of the theory which liability is predicated upon, whether negligence, breach of warranty, strict liability in tort, or other grounds, it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product.

Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury, 51 A.L.R.3d 1344, § 2(a) (footnotes omitted). Thus, in the instant case, absent an allegation that BIF or McKesson was in some way responsible for the allegedly injurious product, the plaintiffs' claims have no chance of success.

### 3. Boilerplate Allegations are not Sufficient

The first paragraph of the plaintiffs' complaint alleges that Pradaxa is "a pharmaceutical product researched, designed formulated, compounded, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed or otherwise placed in the stream of interstate commerce by [all of the named defendants]" (Doc. 1–1 ¶ 1). These generic allegations as to all of the defendants do not establish that McKesson or BIF was, in any way, responsible for the product that allegedly caused the plaintiffs' injuries. The undersigned judge has addressed the inadequacies of such boilerplate allegations on numerous occasions. *See In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2011 WL 1885408 (S.D.Ill. May 17, 2011) (Herndon, C.J.); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2010 WL 3937414 (S.D.Ill. Oct.4, 2010) (Herndon, C.J.); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2010 WL 2402926 (S.D. Ill. June 15, 2010) (Herndon, C.J.); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,*

44

MDL No. 2100, 2010 WL 1963202 (S.D.Ill. May 14, 2010) (Herndon, C.J.).

### 4. Fraudulent joinder as to BIF

*6 Aside from the generic allegations discussed above, the plaintiffs do not allege that BIF manufactured, sold, distributed, or was in any way responsible for the allegedly injurious product. The only specific allegations with regard to BIF are that BIF is California Corporation with its principal place of business in California and that BIF has "conducted business and derived substantial revenue from within the State of California." (Doc. 1–1 ¶ 22). Additionally, BIPI has submitted the declaration of Ralf Otto, the Vice President, Operations and Site Head for BIF (Doc. 1–2). In his affidavit, Mr. Otto asserts as follows:

> 5. [BIF] specializes in the development and manufacturing of biopharmaceuticals, including the development of new biological entities for the treatment of human diseases.
>
> 6. [BIF] does not design, develop, manufacture, distribute, market, label or sell the drug [Pradaxa].
>
> 7. [BIF] is a corporation wholly separate and distinct from [BIPI], and [BIF] is not a parent or subsidiary of BIPI.

(Doc. 1–2 ¶¶ 5–7). Other than referencing their boilerplate allegations, the plaintiffs do not dispute any of the statements in Mr. Otto's affidavit.

Based on the allegations in the complaint and the uncontroverted statements in Mr. Otto's affidavit, it is evident that the plaintiffs cannot establish that BIF was in any way connected to the allegedly injurious product. Accordingly, the plaintiffs's claims against BIF have no chance of success in state court.

### 5. Fraudulent joinder as to McKesson

McKesson is a wholesale distributor of prescription medications that purchases pharmaceuticals for sale to retail pharmacies. The only specific allegations with regard to McKesson are as follows: (1) McKesson is "a pharmaceutical distribution and marketing company organized and existing under the laws of the State of Delaware, with its headquarters [in California]" and (2) McKesson "was in the business of promoting and distributing the pharmaceutical product Pradaxa" (Doc. 1–1 ¶¶ 27–28).

The plaintiffs do not allege that McKesson distributed or supplied the Pradaxa that caused their alleged injuries. As the undersigned judge has explained in other decisions, alleging that McKesson is *a* distributor of Pradaxa is not the same as alleging that McKesson is *the* distributor that supplied the pills ingested by the plaintiffs. *See e.g., In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2011 WL 1885408 (S.D.Ill. May 17, 2011) (Herndon, C.J.). Absent such an allegation, there is absolutely no causal link between McKesson and the allegedly injurious product. Accordingly, the Court finds that the plaintiffs' claims as to McKesson have no chance of success under state law.

### D. Fraudulent Joinder Warrants Dismissal of BIF and McKesson

Resolving all issues of fact and law in favor of the plaintiffs, the Court concludes that the plaintiffs have no chance of establishing a cause of action against McKesson or BIF under substantive state law. Accordingly, the Court concludes that BIF and McKesson have been fraudulently joined. The Court's fraudulent joinder finding warrants dismissal of the fraudulently joined defendants. *See Walton u. Bayer Corp.,* 643 F.3d 994, 999–1001 (7th Cir.2011) (finding of fraudulent joinder is ground for dismissing defendant from lawsuit).

*7 The Court therefore **DISMISSES** McKessson and BIF.

### E. Remand is Denied

In light of the Court's finding that the plaintiff cannot sustain a claim against the nondiverse defendants, there is now complete diversity. The second requirement for jurisdiction is that the amount in controversy must exceed $75,000. The plaintiffs contend that, because the amount in controversy is not expressly alleged, it is "unclear how Defendants can properly allege or establish this crucial element of diversity jurisdiction" (Doc. 14 p. 11 n. 1). The Court is not persuaded.

The plaintiffs claim that they suffered "physical, economic and emotional injuries" including the following:

> Plaintiff Thelma Butner: "gastrointestinal bleeding and bleeding ulcers, resulting in the need for four pints of blood and two pints of blood plasma, as well as other permanent injuries, such as general physical weakness and reduction in vision." (Doc. 1–1 ¶ 11)

Plaintiff Clifton Fitzsimmons: "cerebral and gastrointestinal bleeding, resulting in the need for six pints of blood and one pint of blood plasma." (Doc. 1–1 ¶ 13)

Plaintiff John Wilchinski: "cerebral bleeding and stroke, resulting in permanent long term injuries and the removal of his right foot." (Doc. 1–1 ¶ 15).

Plaintiff George Fletcher: "gastrointestinal bleeding, resulting in the need for fourteen pints of blood and removal of his lower intestine." (Doc. 1–1 ¶ 17)

Plaintiff Pauline B. Aldridge: "gastrointestinal bleeding and bleeding ulcers, resulting in serious long term injuries." (Doc. 1–1 ¶ 18)

These alleged injuries make it abundantly clear that the plaintiffs are seeking damages in excess of $75,000. *See Walton u. Bayer Corp.,* 643 F.3d 994, 998 (7th Cir.2011).

Therefore, the Court **FINDS** that it has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and the plaintiffs' motion to remand is **DENIED.**

## IV. CONCLUSION

For the reasons discussed above, the Court **FINDS** and **ORDERS** as follows:

The nondiverse defendants, Boehringer Ingelheim Fremont, Inc. and McKesson Corporation, were fraudulently joined. Accordingly, Boehringer Ingelheim Fremont, Inc. and McKesson Corporation are **DISMISSED.**

The removal was procedurally proper. Additionally, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 (the amount in controversy is met and, in light of the dismissal of the nondiverse defendants, complete diversity exists). Therefore, the plaintiffs' motion to remand is **DENIED.**

**IT IS SO ORDERED.**

Footnotes

1    The plaintiffs' reply brief, if any, was due on January 16, 2013 (Doc. 26). On January 17, 2013, the plaintiffs' simultaneously filed a reply brief (Doc. 28) and a motion for extension of time to file (Doc. 29) stating counsel mistakenly believed the reply was due on January 17, 2013. Although the Court has considered the plaintiffs' reply brief, the Court notes it could have stricken the briefing for timeliness and for failure to comply with Local Rule 83 .1(f) (the filing attorney did not file a written entry of appearance until February 19, 2013 and only did so after being contacted by the Court, out of courtesy, on two separate occasions). The Court also reminds the plaintiffs that reply briefs are not favored and should be filed only in exceptional circumstances. S.D. Ill. Local Rule 7.1(c). The plaintiffs' reply brief does not state whether exceptional circumstances are present as required under Local Rule 7 .1(c). *Id.* The Court may not be so lenient in the future.

2    The named defendants are Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") (a citizen of the States of Delaware and Connecticut), Boehringer Ingelheim Fremont, Inc. (a citizen of the States of Delaware and California), Boehringer Ingelheim Pharma GmbH & Co. KG. (a citizen of the foreign state of Germany), Boehringer Ingelheim International GmbH (a citizen of the foreign state of Germany), Bidachem S.P.A. (a citizen of the foreign state of Italy), McKesson Corporation (a citizen of the States of Delaware and California), and Does 1–100 (Doc. 1 ¶¶ 22–27).

3    In their motion to remand, the plaintiffs erroneously assert this case was removed by defendants Boehringer Ingelhei Pharmaceuticals, Inc., Boehringer Ingelheim Fremont, Inc., Boehringer Ingelheim Pharma GMBH & Co. KG, Boehringer Ingelheim Pharma GMBH & Co. KG, Boehringer Ingelheim International GMBH, and Bidachem S.P.A. (Doc. 14 p. 1). The notice of removal, however, was filed by BIPI alone (Doc. 1).

4    This parallels the rules governing cases transferred pursuant to 28 U.S.C. § 1404(a). *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 243, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (transferee court must apply the choice of law rules of the State from which the case was transferred); *Barron v. Ford Motor Co. of Canada Ltd.,* 965 F.2d 195, 197 (7th Cir.1992) (noting that when a case is transferred on grounds of convenience, the transferee court must apply the conflict of laws rules of the transferor jurisdiction whether the defendant or the plaintiff requested the transfer).

5    A district court sitting in California would apply California conflict of laws rules. *See Malone v. Corrections Corp. of Am.,* 553 F.3d 540, 542 (7th Cir.2009) (A district court sitting in diversity applies the conflict of laws rules of the state in which it sits). California applies a "governmental interest" approach. *Reich v. Purcell,* 67 Cal.2d 551, 554–55, 63 Cal.Rptr. 31, 432 P.2d 727 (Cal.1967). The objective of this approach is to determine the law that most appropriately applies to the issue involved, considering the interests of the

**In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, Not Reported in...**

litigants and all states involved. *Reich*, 67 Cal.2d at 555, 63 Cal.Rptr. 31, 432 P.2d 727. In the instant case, the following jurisdictions might have an interest in having their substantive laws applied: Louisiana (only with regard to the claims of the Louisiana citizens); Tennessee (only with regard to the claims of the Tennessee citizens); California (with regard to the claims of the California citizens and, as the forum, with regard to the claims of all plaintiffs). In addition, Delaware, Connecticut, Germany, and Italy are potentially interested jurisdictions.

6    In the instant case, the plaintiffs assume California substantive law governs all of the plaintiffs' claims (presumably because the case was filed in California). But here, the law of the forum is not necessarily controlling. This is particularly true with respect to those plaintiffs who are citizens of (and were likely injured in) states other than California. *See e.g., Boaz v. Boyle & Co.*, 40 Cal.App.4th 700, 713, 46 Cal.Rptr.2d 888 (although the situs of the injury is not controlling, it remains a relevant consideration).

7    Although the Seventh Circuit has yet to decide which law governs federal claims in cases transferred under 28 U.S.C. § 1407, it has adopted the above rationale when resolving the question under 28 U.S.C. § 1404(a), which authorizes district courts to transfer cases for reasons of convenience. *See McMasters v. U.S.*, 260 F.3d 814, 819 (7th Cir.2001); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1126 (7th Cir.1993), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).

8    In fact, 28 U.S.C. § 1441 indicates that a complaint need only be filed to be removable. *See* 28 U.S.C. § 1441(a) ("any civil action *brought* in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants") (emphasis added). *See also* 28 U.S.C. § 1448 (diminishing the significance of pre-removal service by providing that service may be completed after removal in cases "in which any one or more of the defendants has not been served with process or in which the service has not been perfected prior to removal, or in which process served proves to be defective").

9    The plaintiffs cite to a number of cases addressing the significance of service of process in evaluating whether diversity of citizenship exists (Doc. 14 pp. 11–12). These cases relate to the existence of diversity jurisdiction and are not applicable to the plaintiffs' timeliness arguments.

10    *See e.g. Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir.1993) (overruled on other grounds by *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 540 (7th Cir.2006) (noting that a party's consent "was not needed" where it was not served until after the filing of the removal petition); *Id.* at 368 ("only indispensable defendants are required to join in the petition for removal; the consent of nominal or formal parties is not necessary"); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n. 1 (9th Cir.1988) (fraudulently joined, unknown, nominal, and unserved defendants need not consent); *Salveson v. W. States Bankcard Ass'n,* 731 F.2d 1423, 1429 (9th Cir.1984), superseded by statute on unrelated grounds, as noted in *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1392 n. 3 (9th Cir.1988) ("Our circuit rule is that a party not served need not be joined.").

11    This holding is consistent with a fundamental principle of fraudulent joinder, namely that a defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy." *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921).

12    In fact, the plaintiffs claim that BIPI's interpretation of the forum defendant rule constitutes a "blatant misreading of the statute" that has been rejected by "9th Circuit Courts and courts nationwide as improper gamesmanship by the defense bar" (Doc. 28 p. 5).

13    (*See* Doc. 14 pp. 11–12) (citing *Jennings–Frey v. NYK Logistics Americas Inc.*, No. 2:10–cv09737, 2011 WL 642653 (C.D.Cal. Feb.11, 2011) (not reported) (Nguyen, J) (rejecting argument that citizenship of nondiverse defendant should be disregarded in determining *complete diversity* because nondiverse defendant was not served at the time of removal); *Preasesu v. Prudential Ins. Co.* ., 591 F.2d 74, 78 (9th Cir.1979) (holding that the "properly joined and served" language in section 1441(b) does not alter the requirement of complete diversity and concluding that service is immaterial in assessing diversity); *Pecherski v. Gen. Motors Corp.*, 636 F.2d 1156, 1161 (8th Cir.1981) (holding that section 1441(b) did not expand the removal requirement and stating that in assessing diversity jurisdiction a court "must consider all named defendants, regardless of service.")

14    *Holmstrom v. Peterson,* 492 F.3d 833, 838 (7th Cir.2007) (the forum defendant rule is not jurisdictional; it is a procedural impediment to removal).

15    There are of course exceptions to this general rule. Relevant to the instant case is the doctrine of fraudulent joinder which allows a court to disregard the citizenship of any defendants that have been fraudulently joined. *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 763 (7th Cir.2009).

16    *See e.g., Pullman Co. v. Jenkins,* 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334 (1939) (diversity jurisdiction is determined by the citizenship of the parties, regardless of service of process); *N.Y. Life Ins. Co. v. Deshotel,* 142 F.3d 873, 883 (5th Cir.1998) ("Whenever federal jurisdiction in a removal case depends upon complete diversity, the existence of diversity is determined from the fact of citizenship of the parties named and not from the fact of service."); *Howell by Goerdt v. Tribune Entertainment Co.*, 106 F.3d 215, 217 (7th Cir.1997) (rejecting contention that, in assessing diversity, court could ignore the citizenship of an unserved defendant); see also 14B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3723 (4th ed. 2012) ("A party whose presence in the action would destroy diversity must be dropped formally, as a matter of record, to permit removal to federal court. It is insufficient, for example, that service of process simply has not been made on a non-diverse party[.]").

47

**In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, Not Reported in...**

17  *See e.g., McCall v. Scott,* 239 F.3d 808, 813 n. 2 (6th Cir .2001) ("Where there is complete diversity of citizenship, ... the inclusion of an unserved resident defendant in the action does not defeat removal under 28 U.S.C. § 1441(b)."); *see also* 14B C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 3723, at 341 (4th ed.2012) (the "joined and served" language found in section 1441(b)(2) implies that, in diversity actions, "a diverse but resident defendant who has not been served may be ignored in determining removability."

18  Some courts have carved out a limited exception to the rule that, in diversity cases, section 1441(b)(2) does not bar removal of actions involving an unserved resident defendant. For instance, in *Holmstrom v. Harad,* 2005 WL 1950672 (N.D.Ill. Aug.11, 2005) (Aspen, J.) (relied on by the plaintiffs), the court found that while the presence of an unserved resident defendant normally does not defeat removal, that fact, when coupled with the fact that the removing defendant had not been served, was sufficient to warrant remand. *Holmstrom,* 2005 U.S. Dist. Lexis 16694, at *3–8. The undersigned judge has previously declined to adopt this exception finding it contrary to the plain language of the statute. *See Massey v. Cassens & Sons, Inc.,* 05–0598–DRH (Feb. 16, 2006 Doc. 58 pp. 5–7) (Herndon, C.J.) ("where complete diversity is present ... only the presence of a 'joined-and-served' resident defendant defeats removal ... The statute contains no proviso, and, given its clarity, it is not the Court's role to insert one.").

19  Regardless of which jurisdiction's substantive law governs, the plaintiffs must, at a minimum, establish the particular defendant was in some way responsible for the particular product that allegedly harmed the plaintiffs. *See e.g., DiCola v. White Bros. Performance Products, Inc.,* 158 Cal.App.4th 666, 677, 69 Cal.Rptr.3d 888, 898 (Cal.App.2008) ("As a general rule, a plaintiff claiming to have been injured by a defective product must prove that the defendant's product, or some instrumentality under the defendant's control, caused his or her injury."); *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 597–598, 607 P.2d 924, 928, 163 Cal.Rptr. 132, 136 (Cal.1980) ("as a general rule, the imposition of liability depends upon a showing by the plaintiff that his or her injuries were caused by the act of the defendant or by an instrumentality under the defendant's control.") (internal citations omitted); *Desnoyers v. Wells,* 4 Conn.App. 666, 496 A.2d 237 (Conn.App.1985) (summary judgment in favor of defendant appropriate where evidence showed that defendant did not manufacture, sell or distribute the allegedly injurious product); *In re Asbestos Litigation,* 911 A.2d 1176, 1208 (Del.Super.2006) (imposition of liability requires connection between defendant's product and plaintiff's injury); *Aymond v. Texaco, Inc.,* 554 F.2d 206, (C.A.La.1977) (affirming lower court's directed verdict in favor of manufacturer and noting that manufacturer could not be held liable for worker's injuries where there was no evidence that defective product was manufactured by defendant); *Davis v. Yearwood,* 612 S.W.2d 917 (Tenn.App.1980) (complaint against all possible manufacturers, sellers, distributors, and the like of all possible products that could have caused plaintiffs' injuries, wherein no specific product or entity was identified, court affirmed dismissal for failure to allege facts showing the moving defendant caused or contributed to plaintiffs' injuries). *See also* Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury, 51 A.L.R.3d 1344, § 2(a) (collecting cases).

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

48

**EXHIBIT C**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re REZULIN LITIGATION | CASE NO. CV 03-1647-R(RZx) |
| JACKIE BARLOW; CARMA DEKOVEN; ERNESTINE DELAFONT, ZOE EGGER-MUKARVTZ; and SAMUEL GODBOULDT, | [PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR REMAND |
| Plaintiffs, | |
| v. | |
| WARNER-LAMBERT CO.; PFIZER INC.; JERROLD OLEFSKY; McKESSON CORP., et al. | |
| Defendants. | |

Defendants removed this action from state court to this Court alleging diversity jurisdiction. Defendants asserted that Jerrold Olefsky and McKesson Corp., both of whom are California residents, were fraudulently joined. Plaintiffs moved to remand to state court. The motions came on for hearing by the Court on April 21, 2003.

Having considered the motions and other documents in support of and in opposition to the motions, having heard the arguments of counsel, and being fully advised in the matter, the Court denies the motion.

The Court finds that Dr. Jerrold Olefsky ("Dr. Olefsky"), a patent-holder and clinical investigator, owed no legal duty to any of the plaintiffs, and, therefore, there is no possibility that the plaintiffs can prove a cause of action against Dr. Olefsky. Thus, Dr. Olefsky must be disregarded for purposes of determining federal diversity

1

KAYE SCHOLER LLP

[PROPOSED] ORDER

Exhibit B Page 16

49



jurisdiction.

The Court further finds that there is no possibility that plaintiffs could prove a cause of action against McKesson, an entity which distributed this FDA-approved medication to pharmacists in California. Pursuant to comment k of the Restatement (Second) of Torts Section 402A and California law following comment k, a distributor of a prescription drug is not subject to strict liability.

Accordingly, this Court has diversity jurisdiction over each of these actions. The motion to remand is denied.

IT IS SO ORDERED.

Dated: April 28, 2003

MANUEL L. REAL

MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

Submitted by:

O'DONNELL & SHAEFFER LLP
633 West Fifth Street, Suite 1700
Los Angeles, California 90071
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

KAYE SCHOLER LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

By: _____
Robert Barnes
Attorneys for Defendants
WARNER-LAMBERT COMPANY and PFIZER INC.

KAYE SCHOLER LLP

2

Exhibit B Page 19

50